Your Honor, my name is James Phillips and I represent Mr. Aguilar. I'll also call him Mr. Maldonado, but it's confusing. He goes by Aguilar Maldonado and sometimes he doesn't really mind using either name, but I think legally it's Aguilar. Your Honor, this case involves a road initially started as a road stop on the interstate with a fellow by the name of Rapon who was a mule carrying drugs from one location to the central Arkansas area. There was a road stop and during the course of that stop drugs were found. The police officers convinced Mr. Rapon to cooperate and do a controlled delivery to persons in Little Rock, the central part of Little Rock. And so during the course of this cooperation for the controlled delivery, there were many telephone calls that were intercepted by law enforcement. There were calls to people that we're not exactly sure who they were in other states or even maybe in other countries. And there were calls to a person who was later identified as, I'm going to use his nickname Chewy, if the court will indulge me with that. Chewy was an associate of my client. So basically what happened was that Mr. Aguilar, my client, drove his associate Chewy to Walgreens and met Mr. Rapon, their vehicles. When I say they met, my client never met Mr. Rapon. But Chewy got out of my client's car and got into the other vehicle. The two vehicles then drove to Senior Tequila and a short time later both vehicles drove to my client's home. About two or three blocks away from my client's home, my client took an alternate route, and there was some nefarious purpose alleged for that. But I've been to the location. They're literally identical, the amount of time it takes to get there. When my client arrived, his family was in the front yard. His wife had just come from the grocery store. It's a tiny little house in a poor neighborhood and a tiny, tiny house. The police come in. Groceries are knocked around. Everybody has to lie on the floor. My client's nowhere near where the vehicle was where the drugs were. The police run through the house to do a safety sweep and then eventually ask my client if they could search the house after they've already run through the house. So I am respectfully advocating that the government needed a search warrant or there needed to be consent, that the consent wasn't actually granted in this case. At the hearing on the motion to suppress, now this was done by another attorney who was retained at the time. I'm appointed. I'm just going by the record in that the witnesses for the government testified both at the suppression hearing and at the trial that they could have easily obtained a search warrant, but they didn't, which makes the burden of proof for consent even more important.  Well, what happened factually was that the police were ransacking, were running through the house to see if there's anything harmful in the house, firearms or other persons or whatever. So the police then engaged my client in a conversation. And he basically, it's a little confusing in the record, but basically they ask him, well, can we search your house? And he says, you're already searching my house. And then they go, well, we want to search your house. Well, you're already searching my house. And so now he eventually signed a consent to search that was written in English, and of course English is his second language. We had to have an interpreter at the trial. I thought that was the Spanish form. Oh, no, I'm sorry, Your Honor. It's the Spanish form. You're right. You're right. I think it was the rights form later on that was in English. That's right. Forgive me. I'm sorry. It's a problem having me. I haven't done an oral argument here in 17 years, and I do two in one day. So basically, when my client signed the consent, then the officers, I guess, reasonably believed that they could search the house. They then went on and searched the house. And the testimony is a little unclear because some of the officers said they weren't sure if the consent had already been signed while they were searching or whatever, but I was a little bit unclear about that. But it's unclear as to whether they were actually starting search before what. But they took my client inside the house, and he signed the consent. Now, Judge Miller. Well, let me ask you. Is there any evidence that they went beyond a protective sweep? In other words, there's not a opening a drawer, there's not a fear that there's a person in a drawer. Is there any evidence that they were doing a search that might be considered something beyond a protective sweep prior to the consent? Your Honor, I do not believe there's any evidence of that that I can speak to. So what's your argument? I assume you're challenging the protective sweep itself. What was wrong with them doing a protective sweep? Well, I'm not challenging the protective sweep as such. What I'm challenging is the consent. The basic crux of my argument is that my client acquiesced to a search of his house. And I realize that it's a complicated argument, and for me it's real complicated, maybe not for you. But the court said that he believed Mr. Maldonado. He believed Mr. Maldonado when Mr. Maldonado said the police were already searching his house. In his mind, they were already searching the house. And under these facts, where we have an undereducated man who was born in Mexico, the record indicates that he'd been threatened with being deported, that he did not, he was never advised that he could refuse consent. He was later advised of his Miranda rights after he executed the consent, and he had no criminal history. And so what the basis of my argument is that if the court would, when the court makes the finding that he believes Mr. Maldonado, then I am respectfully arguing that he could not have found that the officers reasonably believed that there was a valid consent.  He believed Maldonado about what? He believed that Maldonado, he believed Maldonado's testimony when Mr. Maldonado testified that there, that when he was executing the consent, he believed that they were already searching the house. Okay, but couldn't he have said no? He was never advised that he couldn't say no. But the law says he doesn't have to be advised of that. He could have said no, but basically what my argument is is that he acquiesced. He just, he sat there with no indication that he was consenting or denying, except that he signed a form. That's my argument, Your Honor. Now, as far as the substantial evidence, this is what the testimony actually proved that my client did. My client actually drove an employee to Walgreens. He followed that employee to Senor Tequila, and he went home. That's the testimony. But there was lots of evidence that there was a drug transaction or a drug conspiracy or something going on. You said employee? Well, he was somebody, an associate, somebody that worked with him. There was lots of evidence. There was a car full of drugs. Of course, that car had nothing to do with my client. He never was, there was no testimony that he was ever even in it. Of course, it did somehow arrive at your client's house. It arrived at my client's house, and it was there for about 10 seconds before the police arrived. And then they found $45,000 and a gun inside the house, right? That's right. That is right. But the gun, there is nothing illegal about him possessing a firearm. He's not a convicted felon. And there's nothing illegal about him having $45,000 in his home. He also had scales. There were scales, which the police could not seem to know whether they worked or not. And tire tools. And tire tools in the back. And, of course, he's in the construction trade. And he had, you know, there were several other tires in the back, and he had a trailer. You know, he does yards and various other, you know, types. He's a handyman. And so he would have tire tools. And so, and it's interesting that the money, which seems like a great deal of money. Well, it is to me. But when you think in terms of there being a million dollars worth of methamphetamine in the car, $45,000 isn't very much. Are they trying to say that he's going to give $45,000 for all this methamphetamine? Of course not. Now, the phone calls that were made in this case did not involve my client at all. And Rapan, who is the courier, I mean the mule that brought the drugs in, he testified when I asked him. He had no knowledge of my client's existence. And so there's not enough evidence that my client, you know, joined in the conspiracy, knew the nature of it, and helped facilitate it. Now, my last point I'd like to make, and I do appreciate the government, because I never would have known, but there was an alternate back there deliberating with the jury. How did everybody miss that? I mean, just think of all the people involved in this case. I'm no trial expert, but a lot of people missed that there were 13. It is 13 who went back, right? Well, yes, sir. Yes, sir. Thirteen went back. Normally you would excuse the alternate, but I just don't know what happened, Judge. And so, you know, the judge had given me the jurors' telephone numbers for another purpose. He said it was fine for me to call them to see how I did in the trial. So I had their numbers, so I started calling. And that's what I put in my motion for a new trial, that they allowed this juror to deliberate, but they knew better than to let her vote. Now, they knew she wasn't supposed to be back there, I guess, but they let her deliberate. Now, the government says that you failed to object. Is that your position? No, that is not. I did object. I filed a motion for a new trial immediately when I found out. And I do appreciate the government. If they had not said anything, I never would have known. But that is not correct. And I would respectfully argue that looking at Alano. There was one alternate juror? Yes, sir. And when? Because as you say, I think the normal procedure is prior to sending the jury back, you dismiss the alternate juror. Right. And that didn't happen, obviously. And there was no objection at that point in time, right? That's correct. All right. So you just mentioned Alano. Are you conceding that plain error applies here or not? Well, what I'm arguing about Alano is that by the fact that the alternate participated was, in fact, prejudice. That's what I'm arguing is the holding in Alano. And I'd like to save the rest of my time for Bob. Thank you. Good morning, Ms. Moore. Good morning. May it please the Court and Counsel, my name is Benicia Moore and I represent the United States in this case. I'd first like to address the defense's argument about the consent to search in this case. Counsel, I hate to do this to you, but this is the first time I've ever seen this in 23 years of an extra juror going back and deliberating. You know, all kinds of state cases and a few federal cases. So I know it's not really fair to you, but would you start with the jury point? Yes, Your Honor. Because this is a wild case. I agree. And to be honest, I don't know how we all missed it. We were all sitting there and it wasn't until we were leaving and I said to my co-counsel, why is the pregnant lady still here? She was pregnant and I don't know how we missed it. But as soon as we realized that she had deliberated with the jury, we followed up. Why she was still there, is that when she came back into the courtroom to deliver the verdict? This was after, yes, after the verdict was delivered and we were leaving. We were wondering why she's still there. So is that the first time that you saw it as well? Yes. So when you say that you don't think that defense counsel objected, are you saying nobody objected at the time she went back and so therefore it's plain error? Or are you saying it seems like he objected as soon as he found out? What's your position on that? Our position is that it is plain error. Nobody objected when she went back to deliberate and nobody objected when the verdict was rendered. You did it the next day, right? The next day, yes, Your Honor. They came back at 645 at night. Yes. What time would the CMECF show you or whatever else show that you filed this thing on the next morning? Is it the next morning, next afternoon? Or do you recall? I don't recall. I believe it was the next day. It wasn't the next morning. Next afternoon. Proceed. Yes. After we were discussing what do you do when that happens because it's never happened to anyone in my office, to be honest. But, yes, I believe it's plain error. And the government's conceding that it was error and it was plain but that the defense hasn't shown any prejudice or hasn't. He has the burden to show that he was prejudiced by the alternate deliberating with the jury and hasn't done that and hasn't articulated specific facts showing that. By the Supreme Court cases, does the defendant have to show anything more than the wrong juror participated? Yes. Under Ilano, it's our position that he has to show that it affected his substantial rights and that he was prejudiced. It's not enough to presume prejudice. Doesn't it say participated? Let me find the quotations. I thought just participation is enough. Your Honor, I would point to the case of United States v. Hill, which was decided by the Eighth Circuit after Ilano, where we have a situation a little more similar to the one here where a alternate juror was allowed to inadvertently deliberate for two and a half hours and the court found that they cannot presume prejudice and that the defendant didn't make an affirmative showing that he was prejudiced by that district court's error. Sounds like in Hill, they did nothing. The defendant did nothing, presented nothing, right? From what I can tell from the opinion. Due to your graciousness, here we have a set of facts. You agree with the facts that are apparently found by the district court. They're asserted in the motion. You kind of agree with them because you say he said it. And then the judge just relies on it. You agree the facts that Judge Miller puts right above his signature there, that those are the facts of this case? Yes. Well, I read that is Ilano itself to say actually participate is prejudice. In fact, they can sit there and if they chill it by body language or anything else. In my reading of Ilano, you'd have to show that they influenced the other jurors or in some way chilled the deliberations by their body language or gestures or something of the like. And I would submit that there's no evidence in the record of that here. Like the court in Ilano noted that before the jurors go back into the jury room when the alternate is there, the alternate is indistinguishable from the other 12. They've been issued the same instructions and they've been present to hear all of the evidence. And in this case, the alternate juror didn't vote. She did participate in the deliberations. She participated, she asked, and she responded to questions. And that's all that we have. And it's our position that the showing requires more than that. It requires to show that in some way her participation caused prejudice to the defendant. You've got to be an unopened book, an examined book, says the Supreme Court, a closed book. It acts like if they open the book that's back there, and there are a lot of cases on opening books in jury rooms, maps and things. Do you think that this juror was an unexamined book, a closed book? I don't know that this juror was. I think that the juror participated in the deliberations. That's not contested. I don't know what her effect of her participation was on the other 12 that voted. And I don't think the defense has shown what effect, if any, her deliberations had, other than all that we know is that they found unanimously that the defendant was guilty. Was there any evidence, I don't know, did he request a hearing where the other jurors might be brought in and asked what her position was? Did she initially suggest guilt or not guilty or anything like that? I'm not certain if defense requested a hearing, but there was not a hearing. And so we did not have the opportunity to ask the jurors under oath what her effect on the deliberations was. So we don't have that in this record. Counsel, I bet you've seen some of these other circuit cases. Some of the other circuits are pretty tough on this. If the alternate participates in any way, through words or gestures, this is Acevedo. This is the 11th Circuit. Prejudice is manifest, says the 11th Circuit. Why shouldn't we follow that line of cases, and there are others? I submit that the court should follow the one case that I could find from the circuit, and is U.S. v. Hill, and that's the direction that I have. And I would suggest that the circuit follow that precedent that says that in a situation somewhere where we did have the alternate deliberating, I don't think that was disputed, we don't know the extent, but that we can't presume that the alternate's presence prejudiced the defendant and that there has to be an affirmative showing. And that's the defendant's burden to show. And it's our position that he hasn't done that here. To turn back to the, if there are any other questions on the alternate juror point, to turn back to the consent to search issue and that the government needed a search warrant, it's our position that the government could have gotten a search warrant and did have probable cause, but it wasn't necessary because the defendant consented to the search of his home. The evidence at the suppression hearing was that when officers, when the car with the methamphetamine arrived at the defendant's home and the defendant arrived behind that car, the scene was secured. Everyone was placed in handcuffs. There was a protective suite. After that was done, the defendant was taken into his home. The handcuffs were removed. He was able to sit at his kitchen table with the agent. He asked if they could search the house. He was given a consent to search form in Spanish. He said he preferred the form in Spanish to English, and he signed that form. And after that was done, then the agents began to search the house. The standard, and I think that Mr. Maldonado didn't testify that he told the agents, well, you're already searching. I think the testimony was that he was thinking they're already searching, so I may as well sign this. Who testified to his thoughts? Mr. Maldonado testified at the suppression. Did he testify that was his thought? Yes, he did. He testified that they're already searching, so I felt like I didn't have a choice. But he didn't. That wasn't communicated to the officers. And the standard is, would the officers reasonably believe that the consent was voluntary? And based on what they knew and what was going on, I believe that that standard is met. Also, and I understand counsel to say that he's not challenging the protective suite, but there's the testimony at the suppression hearing was that when they got there, there were a lot of people present and people coming out of the house. They only went in to secure the residence and came back out. They did not begin to search the house again until after consent was obtained. Is there some testimony about what they did when they did the protective suite? Yes. Detective Mike Welburn testified that he went in, he looked in the closets, in the rooms. It's a very small house. There wasn't anyone else in there, and they came back out. They didn't find any evidence. He didn't otherwise open drawers or that sort of thing? No. No, and no evidence was seen in plain view or found during that protective suite at all. The evidence that was recovered was found after the consent was obtained, and they went back to search more thoroughly. And lastly, addressing the issue of the sufficiency of the evidence, it's our position that there was more than enough evidence here to find that Mr. Maldonado joined the conspiracy to possess with intent to distribute methamphetamine. The evidence was that there was a traffic stop with Mr. Rapin, and they found a large amount of methamphetamine in a tire. He agreed to cooperate and made several recorded calls with the person that he was delivering this for in California and to the person he was going to deliver it to in Little Rock. Officers didn't know where it was going or who it was going to at the time, but there was a meat location at the Walgreens, and Mr. Maldonado and Mr. Chewy or Mr. Laranaga showed up to pick it up. Mr. Laranaga got in the car with Mr. Rapin, and they dropped Mr. Rapin off at a restaurant and said, we're going to go unload this, and we'll come back. When they leave that restaurant, they go back, and officers follow them, and they eventually end up at Mr. Maldonado's house. The car that's driving the methamphetamine goes directly to Mr. Maldonado's house. Mr. Maldonado, following that car, takes a kind of a circuitous route through a residential neighborhood before arriving at his own house behind the car with the methamphetamine. After he's arrested and the house is searched, they find over $45,000 in cash, a firearm, digital scales that have methamphetamine residue on them, and they also find tires and tire tools in the backyard, which are consistent with how they're going to unload the methamphetamine that's in the tire that Mr. Rapin was delivering. Based on all of that evidence, with this highly deferential standards, our position that a reasonable juror could find, and they did find that there was an agreement to distribute this methamphetamine that was delivered to the house. And so for all of those reasons, we'd ask the court to affirm the jury's verdict, to affirm the district court's denial of the motion to suppress, and to find that although there was plain error with the alternate juror deliberating, that the defense has not shown prejudice sufficient to overturn that verdict. Thank you. Mr. Phillips, rebuttal. Thank you, Your Honor. Your Honor. Under Hill, do you think you have to show prejudice or not? Your Honor, Hill, the way I understood it is that that was a juror that was just present. I mean, the juror didn't deliberate, or there was no indication that the juror deliberated. I thought the juror was there for two and a half hours or something like that during deliberation. Right, but there was no indication, there was no evidence that the juror deliberated as I understood the case. And, you know, I'm a little uncomfortable because I'm the advocate and kind of the witness here in this case because, you know, I called the jurors myself. I mean, and then I put that in the motion, and then I was thinking there might be a hearing on the issue, and then it gets denied. But you also didn't notice it when the 13th came back to deliver the . . . Judge, I was . . . during a trial, I don't have . . . I mean, I try to be aware of everything, but that was just something that I . . . you know, I have a client I'm trying to deal with, and I just never noticed it. But it's . . . I think Hill is distinguished because in this case, the government conceded, you know, based upon their response to my motion that I filed, that the juror did deliberate. And the fact that the juror did deliberate is prejudiced. Well, the government wouldn't know whether that juror sat silent or, you know, participated in it. I don't think they can concede something they couldn't possibly know. Well, they . . . their answer more or less did. But I . . . you know, as soon as I spoke with the jurors, I called Ms. Gardner and told her. I discussed it with her. Did you ask for a hearing where you might have been able to establish how she . . . you know, the extent and any influence she might have had? Your Honor, I did not ask for a hearing. I was not . . . I wasn't . . . I wasn't able to have the time to do that. Well, when you filed your motion, you could have. I should have asked for a hearing immediately. I did not, Your Honor. I . . . I guess I just assumed that I would call the courtroom deputy or the law clerk and ask for a hearing. I should have done that. Because I only talked to two or three of the jurors before I realized what was . . . what had actually happened. I used up some of your time, so if you . . . No, Your Honor, I'm . . . I'm . . . I'm . . . I'm . . . I'm . . . The only thing I . . . I . . . I . . . There was one small thing, but it's not worth addressing. Thank you so much. And, Judge, I appreciate . . . We're ready to hear it if you want to. Well, there . . . the protective sweep, it . . . it . . . If the court would look at the evidence of the box where the money was, you know, it . . . it . . . it was found in a closet. And, if . . . if . . . if . . . so . . . so when the . . . they took a picture of the box in the closet, and this literally is a closet, there's nothing in the closet except for this box. And, so, during the protective sweep, obviously, they would have seen that. And, I don't know if that's relevant to anything, but I just want to make sure that small point gets addressed. Very good. We appreciate that. Oh, thank you so much. This has been very . . . Thank you for your argument. The case is submitted. We'll issue an opinion . . .